**Affirmed and Opinion filed June 3, 2021.**



In The

# Fourteenth Court of Appeals

### NO. 14-19-00246-CV

## IN THE MATTER OF R.C., Appellant

**On Appeal from the 315th District Court
Harris County, Texas
Trial Court Cause No. 2017-04332J**

## OPINION

Appellant, R.C., a juvenile, appeals from the trial court's adjudication order finding that he engaged in delinquent conduct by committing the offense of felony murder. In four issues, R.C. challenges the adjudication of the offense. We affirm.

### BACKGROUND

The State charged R.C. by determinate petition[1] with delinquent conduct for

---

[1] For delinquent conduct involving certain offenses (such as felony murder) that remain in the juvenile court, the State has the option of filing a determinate petition and seeking a determinate sentence—one that has a maximum term of years depending on the offense's severity. *See* Tex. Fam. Code Ann. § 53.045(a)(1) (listing felony murder as one of the "Offenses

committing felony murder. In the petition, the State alleged that R.C. (1) intentionally and knowingly committed the "felony offense of evading arrest motor vehicle" by intentionally and knowingly fleeing from a Houston police officer who lawfully attempted to detain R.C.; (2) R.C. used a motor vehicle while in flight; and (3) "while in the course of and furtherance of the COMMISSION OF said offense," R.C. committed "an act clearly dangerous to human life, to-wit: OPERATING THE MOTOR VEHICLE IN A RECKLESS MANNER CAUSING THE VEHICLE TO STRIKE A CURB" and caused Complainant's death. A grand jury approved the determinate petition, and a bench trial was held in March 2018.

At trial, Houston Police Officer Lopez testified that he was driving on the Sam Houston Parkway with his partner in a marked patrol car around 9 a.m. on August 17, 2017. He observed a Chevy Impala with no license plates or temporary plates pass him. The driver was a black male with "very distinctive" hair that was bleached and "orange-ish". Officer Lopez identified R.C. as the driver in court. Officer Lopez testified that he observed the Impala change into the left lane without signaling. Officer Lopez got behind the Impala to stop it for not having license plates and changing lanes without signaling. He turned on the patrol car's lights and sirens. The Impala slowed down and changed into the right lane without signaling. Officer Lopez believed this would "be a regular traffic stop," but the Impala "then sped off, got in the left lane", and appeared "to try to get onto the

_____

Eligible for Determinate Sentence"). To complete the disposition, *i.e.*, to complete the determinate sentence, a juvenile may be held past his 19th birthday, when otherwise the Texas Juvenile Justice Department would "discharge [the juvenile] from its custody" at that time. *See* Tex. Hum. Res. Code Ann. § 245.151(d). To get a determinate sentence for a juvenile, the State must petition the grand jury and obtain its approval. *See* Tex. Fam. Code Ann. § 53.045(a), (d). If the grand jury approves a determinate sentence, the maximum disposition that a juvenile can receive for a first degree felony, such as felony murder, is 40 years. *See id*. § 54.04(d)(3)(A)(ii). In a determinate sentence situation, a juvenile is initially committed to the Texas Juvenile Justice Department with a possible transfer to the Texas Department of Criminal Justice. *Id*. § 54.04(d)(3).

entrance ramp" of the Sam Houston Tollway. Because "[t]here was traffic going to" the tollway, the Impala changed back into the right lane.

Officer Lopez testified that the Impala slowed down as it approached West Airport Blvd. He noticed Complainant in the passenger seat and noted that he had dark hair and put his hands and head out of the car window. The Impala sped up again and turned onto West Airport Blvd. The road had two lanes each going westbound and eastbound with a concrete and grass median in-between; the speed limit was 45 MPH. Officer Lopez believed he pursued the Impala at "80-something" MPH, and he estimated the Impala was driving "[a]t least 90-something." He believed it was unsafe to drive at that speed because the road was uneven. Officer Lopez stated he slowed down his patrol car because the road was uneven and "bumpy", especially entering the residential area. During the chase, Complainant put his hands out the window multiple times. Officer Lopez testified that R.C. drove erratically and "switched lanes multiple times to go around vehicles." Officer Lopez testified that R.C.'s driving was unsafe at that high speed on that road and put other drivers as well as Complainant in danger.

Officer Lopez observed R.C. first hitting the concrete median curb as he was driving in the left lane; both the back and front tire went over the curb. R.C. then "started fishtailing, overcorrected, went to the right median — to the right lane and hit the curb." After hitting the right lane curb, R.C. "kept fishtailing," lost control of the car, started turning sideways, and hit the center median. The car flipped over and, as the car turned, Complainant was "halfway out". The car rolled over Complainant, and "then on the second flip," Complainant was ejected. The car came to a stop when it hit a fire hydrant on the opposite side of the street in a grassy area. Officer Lopez saw R.C. crawl out of the car as the engine block caught fire; R.C. did not appear to be injured. EMS arrived at the scene and

3

pronounced Complainant dead.

J. Townley, a witness to the accident, also testified at trial. Townley stated he noticed the Impala driving a couple hundred yards behind him followed by a police car with flashing lights. He noticed the Impala "drove a little bit erratic." Townley stated he "let off the accelerator" and observed the Impala "started to swerve toward the — kind of towards [his] lane, struck a median, and rolled several times." Once the Impala started rolling, Townley "observed an ejection of an individual from the vehicle."

The State presented testimony from its accident reconstructionist, Houston Police Detective Veal. He testified that he was called to the scene shortly after the crash and conducted an investigation. He observed the road was dry, but there was a curve in the road "leading up to where the crash actually occurred." Detective Veal calculated that R.C. was driving at a minimum speed of 68 MPH before he lost control of the car. He explained this was a conservative estimate based on the fact that the Impala did not come to a stop on its own but was stopped by a fire hydrant. He stated that R.C. could possibly have driven faster than 68 MPH before the crash because "we don't know how much further the vehicle would have tumbled" had it not hit the fire hydrant and his calculations were "just based off of where the vehicle ended up." A surveillance video from a business about one mile from the crash site was introduced into evidence. It showed the Impala followed by the police car traveling at a higher speed than other traffic.

Photos of the roadway and the accident scene were admitted into evidence showing fresh tire and rim marks and scrapes on the roadway as well as the places where the vehicle hit the left curb and the center median curb before starting to roll. Detective Veal explained the median acted as a tripping mechanism and "sent the vehicle to start actually rolling over." He also explained that the Impala did not

4

have rollover sensors, so the airbags did not deploy. He stated that people wearing a seatbelt "will have seatbelt marks or redness around the collarbones" and determined that Complainant was not wearing a seatbelt. He stated he was not sure if R.C. was wearing a seatbelt but confirmed that R.C. "didn't have any injuries indicative of wearing a seatbelt."

Detective Veal also confirmed that "in order for a seatbelt to operate properly if it was on or airbag to deploy properly, your seat has to be in a proper position to take advantage of those safety features" but Complainant's seat was reclined so Complainant "was not in a position to take advantage of those safety features." Detective Veal agreed that it "would make it real difficult to have a seatbelt even work" when a person is hanging outside the car. He concurred that had Complainant "been wearing a seatbelt and . . . had his seat in the proper position, it's probable he would not have been ejected from the vehicle." He further agreed there was not "really anything to say that just because someone wasn't wearing a seatbelt during this accident that they were going to die."

Detective Veal testified that Complainant would not have been ejected from the Impala if R.C. "had pulled over safely when officers initiated their traffic stop" or if R.C. had driven at a safe speed. Based on his investigation, Detective Veal determined that the following acts R.C. committed were clearly dangerous to human life: traveling well over the speed limit, fleeing from a marked police unit, failing to drive in a single lane, and losing control of the vehicle.

R.C. presented testimony from his own accident reconstructionist, James Barthelme, whom he retained on April 20, 2018. Barthelme testified he reviewed the complete HPD investigation report as well as the photos from the accident scene. He also personally went to see the road and area where the crash occurred. He testified that, at the time he went to inspect the road and accident site over six

months after the accident, the location was "relatively flat" and the road was in "decent repair." He testified his "estimation of speed basically ranges from 53 miles an hour up to 65 miles an hour" as the Impala "hit the curb where the HPD investigation says that it hit the curb." Although Barthelme did not see "photos that indicated seatbelt condition or location," he saw photos that the driver's and passenger's seats were reclined.

Barthelme opined that when one does not wear a "seatbelt in an accident like this," one becomes "a projectile inside of the vehicle because you're not restrained." He testified that Complainant's autopsy report listed the cause of death as blunt force trauma, which in his opinion "happened during the accident, either inside the vehicle or as [Complainant] was ejected." Barthelme testified that the blunt force trauma "would be less severe and less probable" if Complainant had worn a seatbelt and his seat had been in the upright position, but Barthelme acknowledged that his report states that "the use of seatbelts by both occupants in the vehicle was undetermined." He acknowledged that seatbelts are designed to restrain people in their seat if the seat is upright. He further acknowledged that in this case it "could be true" that "having a reclined seat and not wearing a seatbelt was not really indicative of whether or not one would survive that crash." He concurred that if R.C. "had pulled over safely when officers initiated their initial traffic stop that [Complainant] probably wouldn't have been ejected from the seat without some other force taking place."

The trial court also heard R.C.'s testimony. R.C. claimed he bought the Impala the morning of the accident for $2,500 from a person whose full name he did not know. He testified he had $5,000 in cash at the time but could not remember where he got the money from. He admitted he had no job but denied stealing the money. R.C. only had the keys to the car but no title; he also did not

6

have a driver's license. He claimed he drove to a hotel to pick up Complainant after he bought the Impala. According to R.C., Complainant was so excited that R.C. had a car that Complainant insisted on driving it. R.C. testified he fell asleep while Complainant drove but that Complainant woke him up because the police followed them. Complainant asked R.C. to switch seats and R.C. agreed. Once R.C. got into the driver's seat, he turned around and saw the police.

R.C. testified that after he hit the brakes too hard at the stop light, the police pulled up behind him and turned on the flashing lights. R.C. claimed he did not stop the car because Complainant did not want him to. He admitted driving above the 45 MPH speed limit and "weaving between lanes" during the chase. He claimed he lost control of the wheel because Complainant allegedly hit him on the shoulder and he became distracted. The driver's side front wheel touched the curb and jerked the steering wheel. R.C. admitted he "was moving too fast". R.C. claimed he was wearing his seatbelt and did not have his seat reclined during the car chase but that Complainant was not wearing a seatbelt and had his seat reclined.

R.C. admitted he saw lights and sirens and knew the police were chasing him trying to pull him over, but he "made the conscious decision to intentionally flee from the police" and not stop. He admitted he "decided [he was] going to try to get away from the police officers, so [he was] going to go as fast as [he could] to do that." R.C. also admitted he was a sixteen-year-old runaway at the time of the accident, was in violation of his probation, and knew there was a warrant out for his arrest. R.C. acknowledged that he did not have any injuries on his "chest consistent with wearing a seatbelt."

After hearing the evidence presented, the trial court concluded R.C. engaged in delinquent conduct as alleged in the State's petition and assessed his punishment

at eight years' confinement in the Texas Juvenile Justice Department. R.C. filed a timely appeal.

ANALYSIS

R.C. challenges the trial court's adjudication order raising the following four issues:

> 1. Whether the evidence was factually and legally insufficient (which should be required in any juvenile conviction) to support the Juvenile Court's findings that R.C. committed Felony Murder?
>
> 2. Should the law of new and independent cause be applied in a juvenile case where the Complainant failed to wear a seat belt which caused his ejection from the vehicle which resulted in his death?
>
> 3. Did the court err in applying the felony murder rule to the accident that occurred in this case?
>
> 4. Did the trial judge err in applying the felony murder rule to Appellant's conduct as his acts were not clearly dangerous to human life that resulted in the death of another human?

We begin by addressing R.C.'s first two issues before turning to issues three and four.

## I.     Sufficiency of the Evidence

### A.     Standard of Review and Governing Law

"The Legislature enacted the Juvenile Justice Code as a separate system for the prosecution, adjudication, sentencing, and detention of juvenile offenders to protect the public and provide for the wholesome moral, mental, and physical development of delinquent children." *In re Hall*, 286 S.W.3d 925, 927 (Tex. 2009) (orig. proceeding); Tex. Fam. Code Ann. § 51.01(1), (2), (3). The Family Code covers the proceedings in all cases involving a child's delinquent conduct. Tex. Fam. Code Ann. § 51.04(a). Juvenile courts generally have exclusive original

8

jurisdiction over proceedings involving a child's delinquent conduct by a person who was a child at the time that the person engaged in the conduct.[2] *In re Hall*, 286 S.W.3d at 927. Delinquent conduct is conduct, other than a traffic offense, that violates a penal law of Texas or of the United States punishable by imprisonment or by confinement in jail. Tex. Fam. Code Ann. § 51.03(a)(1); *In re D.L.*, 541 S.W.3d 917, 919 (Tex. App.—Houston [14th Dist.] 2018, no pet.).

In a juvenile proceeding, the trial court first conducts an adjudication hearing for a factfinder to determine whether the juvenile engaged in delinquent conduct. *See* Tex. Fam. Code Ann. § 54.03(a). If the factfinder determines the juvenile engaged in delinquent conduct, the trial court must conduct a disposition hearing. *See id.* § 54.03(h); *In re D.L.*, 541 S.W.3d at 920. "Disposition is akin to sentencing and is used to honor the non-criminal character of the juvenile proceedings." *In re D.L.*, 541 S.W.3d at 920. An order of adjudication or disposition generally does not constitute a criminal conviction. *See* Tex. Fam. Code Ann. § 51.13(a); *In re B.D.S.D.*, 289 S.W.3d 889, 893 (Tex. App.—Houston [14th Dist.] 2009, pet. denied).

Proceedings in juvenile court are quasi-criminal in nature but classified as civil cases. *In re Hall*, 286 S.W.3d at 927; *In re D.L.*, 541 S.W.3d at 919. The burden of proof at the adjudication hearing is the beyond-a-reasonable-doubt standard applicable to criminal cases. *See* Tex. Fam. Code Ann. § 54.03(f). Therefore, we review the sufficiency of the evidence to support a finding that a juvenile engaged in delinquent conduct using the standard applicable to criminal cases.[3] *In re D.L.*, 541 S.W.3d at 920; *In re R.R.*, 373 S.W.3d 730, 734 (Tex.

---

[2] Generally, a "child" is defined as a person who is ten years of age or older and under seventeen. *See* Tex. Fam. Code Ann. § 51.02(2).

[3] As a preliminary matter, R.C. argues that we should review both the legal and factual sufficiency of the evidence "in juvenile criminal case appellate review." In support of his

App.—Houston [14th Dist.] 2012, pet. denied).

Under this legal sufficiency standard, we examine all the evidence adduced at trial in the light most favorable to the verdict to determine whether a factfinder was rationally justified in finding guilt beyond a reasonable doubt. *Temple v. State*, 390 S.W.3d 341, 360 (Tex. Crim. App. 2013); *In re R.R.*, 373 S.W.3d at 734; *see Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This standard applies to both direct and circumstantial evidence; "circumstantial evidence is as probative as direct evidence in establishing a person's guilt, and circumstantial evidence alone can be sufficient to establish guilt." *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007); *see also In re R.R.*, 373 S.W.3d at 735. Although we consider everything presented at trial, we do not substitute our judgment regarding the weight and credibility of the evidence for that of the factfinder. *Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012); *see also Williams v. State*, 235 S.W.3d 742, 750 (Tex. Crim. App. 2007). We presume the factfinder resolved conflicting inferences in favor of the verdict, and defer to that determination. *In re R.R.*, 373 S.W.3d at 735; *see also Clayton*, 235 S.W.3d at 778. We also determine whether the necessary inferences are reasonable based upon the combined and cumulative force of all the evidence when viewed in the light most favorable to the

contention, he cites *Moon v. State*, 451 S.W.3d 28 (Tex. Crim. App. 2014), *overruled by Ex parte Thomas*, No. WR-89,128-01, 2021 WL 1204352 (Tex. Crim. App. Mar. 31, 2021). We decline to apply a separate factual sufficiency review of the evidence. Following *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010), this court already has held that the legal sufficiency standard is the only standard a court may apply in juvenile delinquency cases in determining whether the evidence is sufficient to support each element that the State is required to prove beyond a reasonable doubt. *In re R.R.*, 373 S.W.3d 730, 734 (Tex. App.—Houston [14th Dist.] 2012, pet. denied); *see also In re D.L.*, 541 S.W.3d at 920; *In re I.F.M.*, 525 S.W.3d 884, 886-87 (Tex. App.—Houston [14th Dist.] 2017, no pet.); *In re J.W.*, No. 14-12-00675-CV, 2014 WL 708484, at *4 (Tex. App.—Houston [14th Dist.] Feb. 20, 2014, no pet.) (mem. op.). Additionally, R.C.'s reliance on *Moon* is misplaced as it has been overruled by the Court of Criminal Appeals in *Ex parte Thomas*, 2021 WL 1204352, at *4-9. In fact, the court posed the question, "So What is Left of *Moon*?", and then answered, "Nothing." *Id.* at *7.

verdict. *Arroyo v. State*, 559 S.W.3d 484, 487 (Tex. Crim. App. 2018); *Clayton*, 235 S.W.3d at 778.

"Felony murder is an unintentional murder committed in the course of committing a felony." *Threadgill v. State*, 146 S.W.3d 654, 665 (Tex. Crim. App. 2004). As applicable here, a person commits felony murder if he "commits or attempts to commit a felony, other than manslaughter, and in the course of and in furtherance of the commission or attempt, or in immediate flight from the commission or attempt, he commits or attempts to commit an act clearly dangerous to human life that causes the death of an individual." Tex. Penal Code Ann. § 19.02(b)(3); *Contreras v. State*, 312 S.W.3d 566, 583-84 (Tex. Crim. App. 2010).

The "act clearly dangerous to human life" must be the cause of the victim's death. *Rodriguez v. State*, 454 S.W.3d 503, 507 (Tex. Crim. App. 2014). Whether the act is clearly dangerous to human life is measured by an objective standard and not the subjective belief of the actor. *Lugo-Lugo v. State*, 650 S.W.2d 72, 81 (Tex. Crim. App. 1983); *McGuire v. State*, 493 S.W.3d 177, 188 (Tex. App.—Houston [1st Dist.] 2016, pet. ref'd).

A person commits the offense of evading arrest or detention if he intentionally flees from an individual he knows is a peace officer attempting lawfully to arrest or detain him. Tex. Penal Code Ann. § 38.04(a). This offense is a state jail felony if the person uses a vehicle while in flight and has not been previously convicted of evading arrest or detention. *Id*. § 38.04(b)(1)(B). R.C. does not challenge the allegations against him of committing the felony of evading arrest with a vehicle.

## B. Application

In his first issue, R.C. challenges the sufficiency of the evidence to support

11

the trial court's finding that he committed felony murder. He claims "the State did not produce sufficient evidence that evading the police in a motor vehicle is (1) per se an act clearly dangerous to human life, (2) that the totality of circumstances make clear the death of the Complainant was in fact caused by [him] not wearing a seat belt, (3) that the facts cited by Detective Veal were contradicted or minimized by Veal in his cross-examination." In his second issue, R.C. argues the trial court should have applied "the law of new and independent cause" because "Complainant failed to wear a seat belt which caused his ejection from the vehicle which resulted in his death." R.C. argues we should "adopt the civil rule of new and independent cause in this case" and points to "the Supreme Court of Texas decision in *Nabors Well Services, Ltd. v. Romero*, 456 S.W.3d 553 (Tex. 2015) where the court recognized that 'relevant evidence of use or non-use of seat belts, and relevant evidence of a plaintiff's pre-occurrence injury causing conduct generally is admissible for the purpose of apportioning responsibility.'" Because R.C.'s first and second issue are interrelated, we address them together.

We begin by declining R.C.'s invitation to "adopt the civil rule of new and independent cause." As we stated, although juvenile proceedings are nominally civil, they are quasi-criminal in nature. *See In re E.J.G.P.*, 5 S.W.3d 868, 871 n.5 (Tex. App.—El Paso 1999, no pet.). Numerous aspects of a juvenile delinquency adjudication are governed by criminal law statutes and rules, including the State's burden of proof, the presumption of innocence, the right to trial by jury, the privilege against self-incrimination, the right to confront witnesses, and the right to representation by counsel. *See id.*; *In re R.S.C.*, 940 S.W.2d 750, 751-52 (Tex. App.—El Paso 1997, no pet.); *see also* Tex. Fam. Code Ann. § 54.03. Further, Texas Family Code section 51.03(a) defines delinquent conduct as conduct that violates Texas penal law. Tex. Fam. Code Ann. § 51.03(a)(1). The Texas Penal

Code in turn provides the causation definition applicable in Texas penal law. Tex. Pen. Code Ann. § 6.04. We therefore find it appropriate and logical to look to criminal law in determining causation as part of R.C.'s evidentiary sufficiency challenge. *See In re E.J.G.P.*, 5 S.W.3d at 871-72 & 871 n.5 (applying criminal law to determine if the possibility of deportation is a mandatory admonishment in a juvenile proceeding); *In re K.W.G.*, 953 S.W.2d 483, 487-88 (Tex. App.— Texarkana 1997, pet. denied) (applying criminal standards to review charge error and conduct harm analysis in juvenile proceeding).

Texas Penal Code section 6.04, titled "Causation: Conduct and Results", states that a "person is criminally responsible if the result would not have occurred but for his conduct, operating either alone or concurrently with another cause, unless the concurrent cause was clearly sufficient to produce the result and the conduct of the actor clearly insufficient." Tex. Pen. Code Ann. § 6.04(a). R.C. argues that Complainant's death "was in fact caused by the not wearing a seat belt." However, based on the causation definition, unless Complainant's failure to wear a seatbelt "was clearly sufficient to produce" Complainant's death and R.C.'s reckless driving was "clearly insufficient," then the failure to wear a seat belt was at most a concurrent cause of Complainant's death.

Here, Complainant's failure to wear a seat belt alone did not cause his death. The evidence shows that R.C.'s erratic driving, speeding, losing control of the vehicle, and hitting two curbs before hitting the center median curb caused the vehicle to roll over twice and eject Complainant on the second roll-over. But for R.C.'s reckless driving and hitting the median curb (which acted as a tripping mechanism that caused the vehicle to roll over multiple times), Complainant would not have died in this case. Detective Veal testified that Complainant would not have been ejected from the vehicle had R.C. not fled from the police and driven at

13

a safe speed. Although Detective Veal concurred that Complainant probably would not have been ejected from the vehicle had Complainant been wearing a seat belt and had his seat been in the proper upright position, Detective Veal nonetheless agreed that passengers are not "ejected from vehicles that are driving down roadways at safe speeds without some other force." He also agreed that there was not "really anything to say that just because someone wasn't wearing a seatbelt during this accident that they were going to die."

Even R.C.'s expert Barthelme acknowledged that in this case it "could be true" that "having a reclined seat and not wearing a seatbelt was not really indicative of whether or not one would survive that crash or not" as he could not determine whether R.C. was also not wearing a seat belt at the time of the accident. Barthelme agreed that if R.C. had pulled over safely when officers initiated their traffic stop, Complainant "probably wouldn't have been ejected from the seat without some other force taking place." He agreed that "the faster a vehicle is traveling when it crashes, the more force that's exerted when that vehicle rotates, rolls, and crashes." Based on the evidence, R.C.'s reckless driving caused the accident and Complainant's failure to wear a seat belt was (at most) a concurrent cause of his death. Concurrent causation does not render the evidence insufficient in this case. *See id.*

R.C. also claims that the State did not present sufficient evidence that evading the police in a motor vehicle is per se an act clearly dangerous to human life. He states the Houston Police Department's Vehicle Pursuit Report "shows that evading in a motor vehicle, which was the underlying felony used by the State to justify its felony murder charge, shows on[ly] .06% of police chases in Houston resulted in deaths and only 5.6% resulted in injuries." However, whether the evidence shows that evading arrest in a motor vehicle is not an act clearly

14

dangerous to human life is not determinative or relevant because there is no requirement in the statute that the State prove the underlying felony is clearly dangerous. *See* Tex. Penal Code Ann. § 19.02(b)(3); *Contreras*, 312 S.W.3d at 583-84. Nor did the State allege in its petition that R.C.'s evasion of arrest in a motor vehicle was the act clearly dangerous to human life; instead, the State alleged that R.C.'s reckless driving was an act clearly dangerous to human life.

R.C. also argues the evidence is legally insufficient because Detective Veal contradicted himself in some of his direct and cross-examination testimony. First, we note that the factfinder is the sole judge of credibility and the weight to be attached to witnesses' testimony. *Temple*, 390 S.W.3d at 360. Second, we presume the factfinder resolved conflicting inferences in favor of the verdict. *In re R.R.*, 373 S.W.3d at 735. Third, based on the review of the evidence, we cannot agree with R.C. that Detective Veal's testimony was contradictory.

R.C. complains that Detective Veal on direct-examination claimed that speeding at 68 mph in a 45-mph-zone was clearly dangerous to human life "but then agreed it was 55-68 mph and that is not necessarily unreasonable an act clearly dangerous to human life." Detective Veal testified he calculated that R.C. was driving at a minimum speed of 68 MPH before the crash. He explained this was a conservative estimate based on the fact that the vehicle did not come to a stop on its own but was stopped by a fire hydrant. He stated that R.C. could possibly have driven faster than 68 MPH before the crash because "we don't know how much further the vehicle would have tumbled" had it not hit the fire hydrant and his calculations were "just based off of where the vehicle ended up."

On cross-examination, Detective Veal acknowledged he testified months earlier "that the speed that [he] estimated [R.C.] was driving as [R.C.] was followed by the police was between 55 and 68 miles an hour." But his previous

testimony regarding speed was not confined to the time of the crash as it was during direct-examination. He was not specifically asked (and did not previously testify) that he believed R.C. drove less than 68 MPH at the time of the crash; his estimated range was in response to the time R.C. "was followed by the police", which is a much longer timeframe. Further, Detective Veal stated that driving between 55 and 68 MPH "in and of itself" is not necessarily an unreasonable speed. His testimony did not imply that driving between 55 and 68 MPH was a reasonable speed in this case.

R.C. also contends that Detective Veal testified on direct-examination that fleeing from a marked police car was an act dangerous to human life, "but then on cross-examination, conceded evading is not necessarily an act dangerous to human life." Detective Veal testified during direct-examination that he determined (based on his investigation in this case) that R.C. committed the following acts clearly dangerous to human life: "Traveling over the speed limit, fleeing from a marked police unit, fail[ing] to drive in a single lane, and los[ing] control of the vehicle." On cross-examination, Detective Veal was asked if he "agree[d] that evading in a motor vehicle in and of itself is not clearly dangerous to human life." He responded: "Just by itself, no." This testimony does not contradict his direct-examination testimony. Detective Veal was not asked a case-specific question, and he provided no case-specific answer that could be interpreted as contradictory testimony.

R.C. asserts that Detective Veal "said failing to drive in a single lane of traffic is an act clearly dangerous to human life, yet on cross-examination, admit[ted] the video reviewed in this case showed no weaving." Although this statement is true and the surveillance video only showed the Impala (followed by a police car) traveling at a higher speed than other traffic, this is not evidence that

R.C. failed to drive in a single lane of traffic because it only shows a few seconds of the entire police chase. Additionally, R.C. admitted "weaving between lanes," a fact that contradicts his argument.

The record before us contains legally sufficient evidence that R.C. committed an act clearly dangerous to human life by operating the Impala in a reckless manner causing it to strike a curb thereby causing Complainant's death from blunt force trauma received during the roll-over and crash. Officer Lopez testified that (1) he pursued R.C. at "80-something" MPH in a residential neighborhood, (2) R.C. drove "[a]t least 90-something," (3) the road was uneven and "bumpy," and (4) it was unsafe to drive that fast. Testimony also established that R.C. drove erratically and "switched lanes multiple times to go around vehicles" to evade the police.

R.C. admitted "weaving between lanes" during the police chase. R.C. admitted he "made the conscious decision to intentionally flee from the police" and not stop. He admitted he "decided [he was] going to try to get away from the police officers, so [he was] going to go as fast as [he could] to do that." He further admitted he lost control of the Impala, "was moving too fast", and "instead of going with the curb and the median, [he] went against it by accident and [he] went left, [he] turned [the] steering wheel left, and [he] slid." This caused the Impala to hit the center median curb and roll over twice. During the roll-over, Complainant sustained blunt force trauma causing his death. R.C.'s accident reconstructionist opined that Complainant's fatal blunt force trauma "happened during the accident, either inside the vehicle or as [Complainant] was ejected."

In this case, legally sufficient evidence supports a finding that R.C.'s reckless driving was an act clearly dangerous to human life. Speeding is a dangerous activity. *See Aguirre v. State*, 22 S.W.3d 463, 476 (Tex. Crim. App.

17

1999) (en banc). Speeding and reckless driving can constitute acts clearly dangerous to human life. *See Boudreaux v. State*, No. 14-18-00891-CR, 2020 WL 2214447, at *4-5 (Tex. App.—Houston [14th Dist.] May 7, 2020, pet. ref'd); *In re E.B.M.*, No. 2-04-201-CV, 2005 WL 2100481, at *1 (Tex. App.—Fort Worth Aug. 31, 2005, no pet.) (mem. op.); *Jimenez v. State*, 67 S.W.3d 493, 498, 508 (Tex. App.—Corpus Christi 2002, pet. ref'd); *see also White v. State*, No. 05-04-01248-CR, 2005 WL 2625481, at *1-2 (Tex. App.—Dallas Oct. 17, 2005) (not designated for publication), *aff'd*, 208 S.W.3d 467 (Tex. Crim. App. 2006).

Accordingly, we overrule R.C.'s first and second issues.

## II.     Felony Murder Rule

R.C. argues in his third issue that the trial court erred in "applying the felony murder rule to the accident that occurred in this case" because the "State failed to prove beyond a reasonable doubt that the acts by Appellant were clearly dangerous to human life" and "[t]here is substantial evidence elicited at the trial that demonstrates the opposite as detailed herein." R.C. raises the same legal sufficiency challenge he already presented in his first issue. Because we already determined that the evidence is legally sufficient to establish R.C. committed an act clearly dangerous to human life as alleged in the State's indictment and as required for a felony murder finding, we overrule R.C.'s third issue.

R.C. states in his fourth issue that "the trial judge err[ed] in applying the felony murder rule to Appellant's conduct as his acts were not clearly dangerous to human life that resulted in the death of another human." However, R.C. presents no argument relative to this issue. Instead, R.C. goes on to seemingly raise a due process complaint: "The felony murder rule essentially evades or eliminates the *mens rea* requirement for murder. . . . The lack of *mens rea* i[n] this case denies Appellant his due process rights under Article 5 of the Texas Constitution and the

14th Amendment to the United States Constitution. Adding a *mens rea* requirement would cure the due process issue and end abuse of the felony murder rule like in this case."

The felony murder rule dispenses with the necessity of proving the *mens rea* accompanying homicide because the underlying felony supplies the culpable mental state. *Johnson v. State*, 4 S.W.3d 254, 255 (Tex. Crim. App. 1999); *Drew v. State*, 76 S.W.3d 436, 454 (Tex. App.—Houston [14th Dist.] 2002, pet. ref'd). R.C. has not cited any authority finding that the Texas felony murder statute violates constitutional due process.[4] The United States "Supreme Court 'has never articulated a general constitutional doctrine of mens rea' and we have found no authority that the Supreme Court has ever held a state criminal statute unconstitutional for lack of scienter." *Adams v. State*, 357 S.W.3d 387, 389 (Tex. App.—Waco 2011, pet. ref'd) (quoting *Powell v. Tex.*, 392 U.S. 514, 535 (1968)). "The absence of scienter does not render a statute invalid if there is some indication of legislative intent, express or implied, to dispense with *mens rea* as an element of a crime. *Id*. (citing *Staples v. United States*, 511 U.S. 600, 605 (1994)). In *Lomax v. State*, the Court of Criminal Appeals stated that, in enacting the Texas felony murder statute, there was "clear legislative intent to plainly dispense with a culpable mental state." 233 S.W.3d 302, 305 (Tex. Crim. App. 2007) (citing *Aguirre*, 22 S.W.3d at 472-76). We find no support for R.C.'s due process argument.

Accordingly, we overrule R.C.'s third and fourth issues.

---

[4] Because an issue that does not sufficiently distinguish between state and federal constitutional grounds is multifarious, we treat R.C.'s brief as raising only a federal constitutional argument. *See Heitman v. State*, 815 S.W.2d 681, 690 n.23 (Tex. Crim. App. 1991).

## CONCLUSION

We affirm the trial court's adjudication order finding that R.C. engaged in delinquent conduct by committing the offense of felony murder.

/s/    Meagan Hassan
         Justice

Panel consists of Justices Bourliot, Hassan, and Poissant.